Good morning, Your Honors. Kathleen Sullivan for U.S. Life Insurance Company. This case presents the rare instance in which judicial refusal to confirm or intervention to vacate an arbitral award is appropriate. The rare case in which judicial intervention to vacate an arbitral award is appropriate because this is the rare case in which the arbitrators provided a fundamentally unfair process in violation of Federal Arbitration Act 10A3 and exceeded their powers in violation of Federal Arbitration Act 10A4. To begin with the secret hearing that gives rise to U.S. Life's claim of improper procedures under 10A3, the arbitrators faced with this claim of unpaid balances on a reinsurance contract to reinsure payment of workers' compensation claims. The arbitrators were unable in Phase II of the arbitration to reach an agreement. They stated in Excerpts of Record, page 106, the arbitrators said, we are unable to come to a conclusion on which balances to pay. Once they did that, they then entered into a process where they selected their own experts, correct? That's exactly right. And that was with your full participation? It was not with our full participation, and that's the problem, Your Honor. You mean the engagement of those two experts, you did not participate in? It was over our objection. Just to recall, there are four aspects in which we protested. We protested the hearing of the evidence from the independent experts in secret out of the hearing of the parties. We, second, protested the hearing outside the presence of the parties or their counsel without a transcript so that we were never able to review what had transpired between these independent reviewers, who were selected, by the way, by the arbitrators. We did not select them. Yes, but that's my point. That was my point, and I think you missed it. And that was that the process by which they selected those folks was open. They told you about it. They informed you about it, and it's detailed in the record. That's the point I was making. And I have another point about that, and that's this. Throughout the process, isn't it true that until hearing or pre-hearing memos were made, that means scheduled, that each party had access to its own appointed arbitrator? That's not correct, Your Honor. We were not permitted ex parte contact with our own arbitrator. This is not a case in which we were permitted ex parte contact with our arbitrator. The protocol for the replacement arbitrator specified that. I mean, there's reference in the record to that. Am I mistaken? I've looked in the record, and each party had access to their arbitrator on an ex parte basis until pre-hearing memos were filed, and I assume that meant that hearings took place. There was something to be considered. Your Honor, the protocols, I want to get to the protocols in a moment because they affect the interest determination. But just to start with, you are correct that we had notice that the arbitrators were selecting independent reviewers. Fine. You're correct that we had noticed. Exactly. But even assuming we had ex parte access to our own arbitrator, we were not that was not sufficient to give us a chance to review and confront the evidence that was presented. The key here, Your Honor, is really Justice Cardozo's point in the Berizzi case, that however informal arbitration procedures, they're not to be an inquisition. And this became an inquisition because the arbitrators, relying on testimony from the independent reviewers, these independent reviewers operated as expert witnesses. But how do you know they relied on the testimony when you had access to those arbitrators in a hearing in July of that year? The hearings took place with the panel in June, June 21st, 22nd. That's correct, over three days, Your Honor. Right. And then you had access to these folks and an opportunity to comment on their findings, which were given to you before the hearing, correct? That's correct. We did not have any access to what transpired at the hearing. That's incorrect, Your Honor. There was an express ruling by the arbitrators that we could not question the reviewers. I understand that. My point here is, understanding that you did not have access to that particular June 21st, 22nd, three-day process, but the concern I have is this. If you – knowing that you did not, is it your position that it's a 10-8-3, either misbehavior with prejudice or a misconduct, for them to have met with them without a record and your presence? Yes, Judge Shea, it is our position that without a record and without our opportunity to be present and to cross-examine them as to what happened – we weren't allowed to be present. We couldn't cross-examine at the time. We couldn't submit rebuttal evidence to anything that the reviewers said because we weren't aware of what they were saying or what the panel said to them. We didn't have a transcript. And we were expressly forbidden by the panel to cross-examine the reviewers in the two days we did have with them, five hours each. We were expressly forbidden to ask them about, quote, the discussions they had among themselves or the discussions they had with the panel. But you had access to their – you had access to their rulings on these issues, correct? We had access only to their final written report, but the written report was written after the 30 hours of testimony. To put this in context, the whole trial that we were allowed to participate in was 30 hours. The secret hearing in which we were – from which we were excluded over our objection and over the objection, I would point out, of Superior National. Superior National said it's a fundamental due process violation to exclude us from the hearing and to not have a transcript. And then we were additionally forbidden to cross-examine the reviewers after the fact about the conversations. So, Judge Shea, what we were missing, even though we had that final report, what we were missing is any idea of what transpired in a 30-hour inquisition where the reviewers were alone in a room testifying to our panel over our objection. And we had no access to that 30 hours of testimony. Thank you. Now, Your Honor, the Berizzi case is helpful here because Justice Cardozo speaking to the New York arbitration statute, which, as the Supreme Court recently acknowledged in the Hall Street v. Mattel case, it was the basis for the Federal Arbitration Act. In Berizzi, Justice Cardozo says, just because an inquisition is – sorry, just because an arbitration is informal doesn't mean that it's an inquisition. And the problem here is that the arbitral panel that decided our fate and said, as between U.S. Life's claim that $150 million of claims here are overpayment and Superior National's claim that no, zero claims were faulty, that we owed the whole sum, as between those very divergent claims, the arbitral panel that had control over that decision went into a star chamber, essentially, and inquired of expert witnesses whom we were cut off from. It might have been different if we had a transfer. Well, let me pause for a second, because star chamber is obviously a pejorative phrase. It's meant to be a pejorative phrase, but it suggests a procedure that's lopsided. There are lots of different ways to organize adjudication. We use a different system than we use in Europe, and different courts of appeals are set up somewhat differently. What makes this system that the arbitrators decided to use to adjudicate the claim in front of them unfair? The – again, to cite Justice Cardozo, the problem is that there was evidence presented in a situation where we had no opportunity to submit evidence to rebut it. We had no opportunity to submit a rebuttal. Isn't the evidence the – well, two questions come to – that I want to ask. The first is, isn't the evidence that matters, the findings at the end, that's really what – what matters, is what the experts decided the answer was? And there was an opportunity to question them about the merits of that, about the – of those conclusions. Let me start with that. That's correct, Judge Graber. We were permitted to question the reviewers as to their conclusions, but the conclusions followed after 30 hours of secret hearings. And – Well, what if – what if they had done that privately? What if they had simply been given a stack of paper and told, come back, we're not going to speak to you, just read everything and come back and give us your findings? Same findings, same opportunity to talk to them and ask them about those findings. Different result? Yes, Your Honor. That would be a different case, because there they would – Your Honor, if the – it's the findings that you object to, they are substantive and you don't like them. And so it seems to me that that's what's crucial, is the opportunity to ask about those findings. With respect, Your Honor, we disagree, because 30 hours is a very long time in which it was the length of the entire trial that the parties were enabled to participate in. Well, in my hypothetical, suppose it took each expert 100 hours to come up with their findings. Why does that matter? Because, Your Honor, if they were coming up with those findings on their own and we had access to the entire basis for their conclusions based on interrogating their written reports, we wouldn't have been cut off from an interaction with the deciding tribunal. The difference here is, cut off from what happened with the arbitral panel, we have no basis for knowing whether everything was above board. We have no basis for knowing whether there was any kind of bias or influence or something in the questions that the panel asked the reviewers, something that the panel said to the reviewers, don't cover this, cover that, we're not interested in vocational rehab, we're not interested in cumulative trauma, we're not interested in penalties. We have no basis for knowing whether the interaction between the panel and the reviewers tainted the reviewers' report. In your hypothetical — I'm sorry. You weren't finished. Go ahead. I'm sorry, Your Honor. Just in your hypothetical, there would be no basis to suspect that an interaction between the panel and the reviewers had tainted the reviewers' report. What we object to is a decisional process, an evidentiary process, in which the panel took evidence from the reviewers outside of — the experts outside of our presence and without a transcript and with no ability for us to cross-examine the reviewers on the substance of that interaction. We believe that that interaction is what puts us in the dark. We have no idea whether the panel told the reviewers, don't pay attention to this fact or that fact, and we have no idea whether the reviewers said to the panel things that influenced its ultimate decision to rule 100 percent against U.S. life. Now, earlier in your comments, you mentioned that you had no opportunity to rebut with evidence. Does the record give us any hints as to what evidence you would have liked to put in if you had that chance? Yes, Your Honor. The key to the ultimate decision of the panel was their statement that, based on their collective knowledge of the industry's practices, the slippage — the reviewers had found there was sloppy processing — the slippage was within normal limits for the conclusion that this slippage was within the norm for workers' compensation claims. Your Honor, just to explain this peculiar procedure, the original claim was for rescission, and the arbitrators were selected for their underwriting expertise. By their own admission, they had no workers' compensation expertise. So the notion that they would have their own independent knowledge of the industry is — you might ordinarily think that in an arbitration, but that wouldn't be a correct assumption here. The reason they embraced the reviewers was that they were unable, based on their own underwriting expertise, to make determinations about workers' compensation claims. What we wanted was an opportunity — Judge Shea, the problem was that we did get to see the conclusions, but we weren't able to be present. We weren't able to see what happened in a transcript to make sure it was all above board. We weren't able to rebut anything that was said as to custom of the industry or as to practice with respect to all of our objections. And I won't list them all here, but the technical objections were about vocational rehab claims, cumulative trauma claims, whether penalties were compensable. All of those are aspects of workers' compensation law, which we would have liked to rebut with our own expert evidence. The panel decision was unanimous, correct? As to this phase, yes, Your Honor. So the person that you had selected, who represented your selection, the person that you selected for a whole host of reasons that don't need to be articulated but that are, I think, intuitively known, that person was part of the unanimous decision and participated in this conference without your presence, right? Correct, Your Honor. But that's never sufficient to satisfy the FAA. The mere fact that we had selected an arbitrator is not enough to undo a fundamentally unfair procedure. Well, what is it about the FAA that needs your pointing to? What is it that's in violation? 10a3 or 10a3? With respect to the hearing, Your Honor, 10a3, misconduct or misbehavior. Ex parte contacts, as set forth in this by this Court in Pacific Reinsurance. Pacific Reinsurance is a case that said that the — excuse me, Your Honor. Pacific Reinsurance is a case in which this Court said that an ex parte contact that prevents us from submitting or rebutting evidence is per se prejudicial. That's in accord with Berisi. Berisi says when the arbitrator went out into the market and tried to test the bamboo skewers and ask people in the market, take his own evidence outside the presence of the party, that misbehavior was inherently prejudicial because it prevented us from being able to submit evidence. And that's the violation. You're focusing on that aspect of it. The ex parte contact, yes, Your Honor. Okay. So that — If I could reserve the remainder of my time, unless — I think that she has another question. Well, I'm sensitive to the idea that we've been devoted ourselves to one part of your argument, not to the others, the excess, et cetera, 10a4. But on the 10a3, you're talking about misconduct rather than the misbehavior. No, Your Honor. With respect to 10a3, we're talking about both misconduct or misbehavior. Both of those are in 10a3. The cases with respect to ex parte contact have generally described it, as Berisi and Pacific Reinsurance do, as misbehavior, giving rise to inherent prejudice. Right. It's like a structural defect in a criminal trial. If you didn't have counsel at the preliminary hearing, there's a kind of black box. You can't undo the taint. You can't know whether — You just needed to know which of those you were focusing on, whether it was the misbehavior or the misconduct in your scene, essentially. Both, Your Honor, and the alternative. I have more to say about the interest rate being increased under 10a4, but perhaps I'll address that in the rebuttal. If it's mentioned by the other side, it's fair rebuttal, then we'll give you a little bit more time, because we've used up your — on rebuttal, we'll give you some more time. Well, thank you, Your Honor. Just to — thank you, Your Honor. Just to be clear, we do make a 10a4 claim with respect to the addition of new interest after the protocols had — We bothered you a good deal about 10a3 in the meeting that you were concerned about, but we — I think we're all aware of you have a 10a4 issue as well. And the 10a4 with respect to claims after June 30th, 2004 and the increase in the interest  Thank you, Your Honor. Thank you. Good morning, Your Honors. Margaret Grignot for Superior National. U.S. Life contends that the panel committed affirmative misconduct in connection with the retention of the neutral experts in this case by meeting with the neutral experts at an initial meeting before there were hearings and reports and recommendations from the experts. U.S. Life contends in effect that this ex parte contact at the outset of the neutral reviewer proceedings is a per se violation of the Federal Arbitration Act and requires a vacater. But that's not the law. Ex parte contacts are not per se impermissible in a arbitration proceeding. Setting aside the hearing that the other side is concerned about, was there ex parte contact permitted prior to pre-hearing memos being issued? Yes, Your Honor. The record is clear in the protocols and other places that the ex parte contacts between the parties and their party arbitrators were permitted up to a certain point in the arbitration proceedings, and then those were terminated. That's what I thought. With respect to ex parte communications, this Court in two cases, Pacific Reinsurance and Employer's Insurance, has indicated that ex parte communications are, do not require vacater as long as there was a fundamental fairness in the proceedings. And fundamental fairness includes that the ex parte communications were open and above board and not secret, as it was in this case. Well, Pacific Reinsurance suggests a little bit more than that. It suggests that if there was a preclusion of an opportunity to submit or rebut material evidence, that that could be a problem. Apart from where, I mean, you can tell people that you're going to do that, but I read Pacific Reinsurance as saying that even if you tell them ahead of time, there can be an issue if material evidence can't be presented. What is your specific response to the argument that there was material evidence that would have been presented if there had been an opportunity to do that? Your Honors, the reviewers met with the arbitrators for three days prior to the proceedings with the parties. During those three days, the arbitrators spoke amongst themselves with respect to their deliberations and talked to the reviewers about their review of the parties' experts' procedures in this case. Those proceedings were in the nature of deliberative process as opposed to the taking of evidence. After those three days, the reviewers issued an interim report. That interim report had explained the process of the reviewers in arriving at their recommendations. It attached a 165-page spreadsheet, which documented the reporters' or the reviewers' recommendations with respect to the 162 claims that they had reviewed. And that was provided to the parties. The parties thereafter provided written comments on that initial report. And then the hearing was held. I understand your answer. It is that the hearing didn't give them that opportunity. For example, Ms. Sullivan mentioned the idea of bringing in a counter-expert to say, no, this isn't the industry standard. Would that have been permissible for them to do in the case? Your Honor, there's nothing in the record to indicate that U.S. Life was precluded from bringing in any other evidence. Now, the purpose of the two-day hearing was to examine the reviewers. But at no point did U.S. Life request to present any additional evidence, and that certainly was not denied. In fact, after the hearing, the parties submitted a final report, which amended some of the positions they had taken originally. Well, a final report after the hearing is not going to do any good at the hearing. What did they have to work with at the hearing? At the hearing, they had the report of the reviewer's comments.  They had the two reviewers were present. They had their written report, and they had their detailed comments on the spreadsheet indicating what they had done with the particular claims files and why they had arrived at the recommendations they had arrived at. And I'd like to point out one other thing with respect to the reviewer's report and recommendation. Some of that report and recommendation was favorable to U.S. Life. In fact, the reviewers expressly found that U.S. Life should be given deductions for the vocational rehabilitation payments that were made above the cap, that they should be given deductions for the penalties that were paid by Superior National. And in the briefing after the hearing, U.S. Life's attorney asked that the panel give effect to those favorable rulings in its determination. So it was a totally fair, open process. All of the information that the reviewers presented was available to the parties. The parties had complete access. There's no evidence that any information was presented to the panel that was not made available to the parties. Well, just inherently, if there had been, I get lost a number of hours, something like 30 hours of discussion with the panel and the reviewers, and a much more limited time period spent examining the reviewers, at least some of which is going to have to be taken up with explaining what it is the spreadsheets and so forth represent, I suppose, can we have confidence that, in fact, that the parties, and here I speak to both sides. In fact, let me take a step back and revise this question, because I'm sure it seemed like a good idea at the time, but I'm having trouble figuring out exactly why it was done this way, particularly in the face of objections from both sides. Why is it that the arbitrators set it up this way? Do you have an explanation? Your Honor, my explanation is intuitive as opposed to any basis in the record. But it appears from the initial emails that the arbitrators sent to the parties that they had some concern with the way the party's experts had presented the case. And I will point out that U.S. Life had the burden of persuading the arbitrators that they should receive a 22 percent overall deduction in their claims, and to the extent that they didn't do that before the reviewers had anything to do with the case, then they would have lost at that point, and they could possibly view the reviewers' contribution as helping them out to some extent. But the reason that they did it, I think, Your Honor, is because they viewed it as part of the deliberative process. There were three arbitrators. There was all this information, 13 days of testimony, volumes of deposition transcript, innumerable exhibits, spreadsheets from the party's experts, and the arbitrators wanted some help in the deliberative process, and that's how they viewed the reviewers. That's a little odd, isn't it? I mean, it would be as if we left the bench here and said, boy, you know, I've had some insurance cases, but not that many. Maybe we'll go out and hire some experts to help us. It's called log perks, you know. Get the brains out of the operation. But beyond immediate staff, I don't think that we'd have the same issue if it was the arbitrators' own staff that had done the helping. But I guess my point is, how do we decide whether it counts as a deliberative process or, as the other side says, a hearing process? I mean, it has to be one of those two. And each of you has your own characterization, but how do we know which it is? Your Honor, we have to assume that the arbitrators acted in good faith. There's no evidence that they were biased or did not act in good faith. As Judge Shea pointed out, the process was unanimous. The three arbitrators, even the party arbitrator for U.S. Life, agreed that these neutral reviewers should be retained, that this process should go forward. In addition, after that ---- may or may not, but could depend in part on what label we attach to the process. Is it part of the hearing or is it part of the deliberations? And it could be good or bad either way, but I'm not really sure what our standard is or how we pick a label based on this record. Your Honor, I would suggest that you look at the initial emails sent by the umpire or the arbitrators with respect to the neutral reviewers, and if you read those carefully, it becomes clear that they intended these reviewers to be part of the deliberative process. You'll recall that in the beginning, all they intended was to meet with the reviewers during the deliberative process, and the parties had no input whatsoever. So after the parties objected to that process, then the process evolved, where they would be involved with them in the deliberative process, but so that the parties would have fair access and have a fundamentally fair hearing, they then provided the written reports, the opportunity to respond in writing, the two-day hearing under oath, and on the record, another report and more briefing after that. Are you aware of any other cases in which a process very closely analogous to this has happened and been commented on by an appellate court? It just seemed like a very unusual process to me. Your Honor, first of all, I would just indicate that I think we have to divorce ourselves from the judicial context. That's not the question I asked. You know, in the arbitration context, it seemed unusual to me. Your Honor, are there any other cases in which a very similar process has been followed with respect to an arbitration? Your Honor, the case that comes to mind is the Lefkowitz case, and in the Lefkowitz case, the arbitrators retained, that's a Seventh Circuit case, and Judge Posner wrote the opinion, and the arbitrators retained an accounting expert and met with the accounting expert outside the presence of the parties. And Judge Posner indicated that arbitration was different, that the arbitrators were experts, and we didn't have to worry about protecting them from undue pressure from witnesses or experts, and that it was acceptable as long as the fundamental fairness standard was met. And the fundamental fairness standard was met in Lefkowitz, and it was met in Spades here. And that's because of the post-meeting hearings and the opportunity to observe. Yes, Your Honor. Is there anything about, do you recall, counsel, for the other side, or in briefing, identifying something in the panel decision from which one could infer some misconduct? That is, that there was something in the panel decision, as announced, from which one could infer that there was something said in the session rather than in the conclusions that were examined at the hearing following the session? Nothing, Your Honor. In fact, in the award that the arbitrators issued, they expressly said that they considered the recommendations of the reviewers. They took that under consideration, but in the end they decided the case on the evidence and their own industry expertise. They made that clear, that they were not bound by the experts' recommendations. They certainly didn't adopt them whole cloth. They didn't adopt the part of the recommendations that were favorable to U.S. life. And they provided their own conclusion that the claims handling process by Superior National was within industry standards. Do you want to spend a little time on the other parts of the other assignments of error? Yes, please. Let me start with the interest issue. On U.S. life's interest argument that the arbitrators changed the Phase I interest award in violation of the Phase II protocols, the arbitrators' affirmative statements do not support U.S. life's point and effectively contradicted. First, no part of the Phase I award expressly says that the panel was awarding interest to deal with U.S. life's investment profits. It says instead that they're awarding interest on unpaid amounts. In other words, interest as interest and nothing more. Aren't those the same thing? Pardon me? Isn't that really the same thing? I don't think so, Your Honor. Interest is a form of investment return. It's a form of investment return, but it is based on the time value of money. The unjust enrichment award in this case was based on the amount of money that U.S. life had actually earned over this period of time when it had wrongfully retained the amounts of money it should have paid to Superior National. Can you properly get both at the same time? Your Honor, they didn't get both at the same time. But that's really my point, though, because they don't get both at the same time because don't they really speak to the same thing? They're different ways of measuring time value of money. One is a market-based, what does the market pay for an amount of money over a period of time, and the other is what is the actual return somebody receives. And over the last six months, we'd all like to receive interest rather than actual return for our investments in the stock market. What they did here is award interest and then I think revisit the subject in some sense and say, well, in this case, a better number would not be what market interest is, but what U.S. life was actually able to earn with this money. So they substituted one for the other. That's why I begin to wonder, aren't they really speaking to the same thing, just a different form of valuation? Your Honor, I think that the arbitrators looked at the Phase I award, they looked at the protocols, and they decided that unjust enrichment was a different award than the interest award. They specifically said they were not changing the interest award. They didn't award double interest. Now, were they not changing it? They made an award of interest. You say they didn't change it. Was there a double award for that purpose? Didn't they actually take back the interest award and replace it with the market return? No, Your Honor. The Phase I award indicated that there would be a Treasury note interest rate up until April 30, 2005. With respect to the unjust enrichment award, during that period of time, the panel awarded the difference between that rate and the actual rate of return that U.S. life had ordered. For periods after that time, they awarded the U.S. life actual rate of return as unjust enrichment damages. So it wasn't replaced. It was supplemented. Supplemented, yes, Your Honor. Thank you. Okay. Let me talk about the ---- Well, was that in violation of the protocol set up in Phase II? Was it in excess of their authority under 10A4? It was not, Your Honor. The protocols in Phase II said that they could not revisit final decisions made by the arbitrators, and the interest decision was not final. They did not revisit it. They instead awarded additional damages that they were entitled to do under the submissions that the parties made to ---- And it wasn't final because? The arbitrators specifically said in Phase I that the only part of the award that was final was the rescission and reformation portion of the award, and they said nothing about interest or damages being final. Can I? I'm out of time. Yes, Your Honor. Thank you. And we'll give you two minutes because we took a bunch. Thank you, Judge Graber. Three quick record points. First, Judge Shea, to be very clear, and if I misspoke, I want to correct it. Our arbitrator did not agree with the final determination. The arbitrator that we appointed disagreed both in Phase I, that's in Excerpts of Record, page 50, and with the final award after Phase II. I disagree with the Phase II final award. Caleb L. Fowler, that's on ER, page 31. And also, Your Honor, Judge Shea, in answer to the question whether we had access to our appointed arbitrator during the secret hearings, the answer is no, we did not. No, you did not. Because that was cut off as of February, as Your Honor knows. Judge Graber, as to the question whether this was a testimonial hearing or a deliberative hearing, obviously we can't interrogate the deliberative processes of the arbitrators, as we couldn't your processes with your law clerks. But these were not law clerks. These were witnesses. And I think Justice Grignon already conceded that when she said that they created the basis for the arbitral panel's conclusion. Do you agree or disagree with her argument that the Lefkowitz case in the Seventh Circuit spoke to a somewhat similar or parallel situation? And if it did, why shouldn't we adopt that view? We disagree absolutely with that. Lefkowitz, in a four lines of a lengthy opinion on other issues, Judge Posner and Lefkowitz said, it's not clear that the arbitrators ever spoke to the accounting firm about the issue of whether the minority interest shareholders had a stake. He didn't have any basis to think there was even a discussion. By contrast, here, the very point of the 30 hours of hearings was unambiguously to discuss the central issue of the case. The 30 hours of whatever they were. The central issue of whatever they were. Your Honor, just as record support for the position that it was testimonial, I refer you to Excerpts of Record 106. That's the e-mail correspondence from the umpire concerning this procedure. He states at the middle of the page, two reviewers were selected so they are likely to arrive at a consensus opinion. There's no question here they were being used for expert opinion testimony. And finally, Judge Clifton, in response to your question about the interest, this was an unambiguous change in the interest rate. They doubled the interest rate from treasury rate, two to five year treasury rate of return to rate of return on the money, 6.86. That was a change in the interest rate. And the crucial thing is, here, the protocols forbade that. Here, unfortunately, our ---- Well, was it final? It doesn't need to be final. Part of counsel's argument is that that was expressly left open. Is that correct or incorrect? Your Honor, we disagree that it was left open. But even if it was, finality is not a requirement of the protocol. I would refer you to Excerpts of Record pages 41 and 42. That's at Excerpts of Record 41 and 42, you'll find paragraphs 9 and 10 of the protocol. And the words final are not present in that. The exact language is, bottom of 41 in paragraph 9, phase 2 shall be governed by law of the case, meaning that no issue decided by the panel as presently constituted will be revisited if the panel is reconstituted as it was after the tragic death of one of the arbitrators. And second, on paragraph 10 on page 42, the protocol states, the alternative arbitrator, if he's seated, will be governed by the law of the case, meaning that all prior deliberations and decisions, all prior deliberations and decisions are binding on the alternate arbitrator. No finality requirement. I realize your time is up. I'm going to call time out for a second, because I am interested in this. The law of the case doctrine, would that be binding on a court? If a court had said, okay, here's my ruling, this part is final, and there's presumably another part that's not final, would the part that's not final be treated by a subsequent panel of that court? Assume the personnel changed. Would a subsequent panel of that court be bound to the part of the decision not labeled as final under the law of the case doctrine? Possibly not, Your Honor. And were we looking at the default rule of functus officio in the arbitration context, there might be a disagreement about whether the interest rate was final. But all that changed with the protocols. Remember what happens with the protocols. The arbitrator is terminally ill. It's tragic. We have a right to start the arbitration over from scratch. We relinquish that right in exchange, in consideration for the protocols. We would never have agreed to go on with the substitute arbitrator from Superior and National if we thought that the new arbitrator could come in and undo everything that had gone before. So we relinquished our right to start over in exchange for a protocol that says all decisions, all issues, all deliberations, all decisions from this point on are final. And two decisions had already said the interest rate was final at the Treasury rate. First, Superior and National had come in in Phase 1 and said give us 10%. The Phase 1 panel had said no, we give you Treasury rate. We reject that. We take a 10% haircut off the corpus and we give you Treasury rate rather than a 10% rate of interest. And second, Superior and National came back in in the Phase 2 organizational meeting and said give us 10% again, or at least give us rate of return on investment. And again, the panel said no in the organizational meeting, no. We will not change. We will not amend. The exact language in the organizational meeting is we will not amend the rate of interest. Those were issues, deliberations, and decisions that were locked in at the time the protocols are signed. So this is the unusual case, Judge Clifton, in which the default rules really don't apply because we have a very specific modification of the party's arbitration agreement. That's really what the protocols are. And it's obvious that in the world of arbitration, the party's agreement governs the meets and bounds of the arbitrator's discretion. So this is the case where whatever the law of the case might be, whatever functus officio might be in the default rule, this contract said no decision may change. So with respect, I have to respectfully disagree with Justice Grinion that the finality of the interest decision in Phase 1 doesn't matter. Finality is eliminated as a term for law of the case doctrine as of the protocols. So at a minimum, we would respectfully request that you reverse with respect to the $60 million in incremental interest, but we would also ask that you Thank you, counsel. Thank you, Your Honor. The case just argued is submitted, and the arguments of both counsel have been extremely helpful. We appreciate it. Our final case on the docket this morning is Ehrenberg v. Kalusi. We might wait a few minutes until it dies down. Until it quiets. No problem, yes. There are a lot of boxes coming and going.
judges: Graber, Clifton, Shea